## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>   *Plaintiff*,<br><br>v.<br><br>$36,425.58 HELD IN WELLS FARGO<br>ACCOUNT ENDING IN<br>XXXXXXXXX6175, HELD IN THE NAME<br>OF FAMILY PRACTICE OF GREATER<br>NEW HAVEN LLC; One 2011 LEXUS<br>IS350 bearing VIN: JTHCE5C26B5000839;<br>and $40,058.00 IN UNITED STATES<br>CURRENCY<br>   *Defendant*.<br><br>[CLAIMANT: ANATOLY<br>BRAYLOVSKY] | No. |

### VERIFIED COMPLAINT OF FORFEITURE

1.  This is a civil in rem action brought to enforce the provisions of 18 U.S.C. §§

    981(a)(1)(A), 1956(c)(7)(f), and 24(a)(1), which provide for forfeiture of proceeds

    traceable to health care fraud violations in violation of 18 U.S.C. § 1347, as well as 21

    U.S.C. § 881(a)(6), which provides for the forfeiture of proceeds traceable to the

    exchange of controlled substances in violation of the Controlled Substances Act, 21

    U.S.C. §§ 801 *et seq*., and 21 U.S.C. § 881(a)(4), which provides for forfeiture of

    property used to facilitate the exchange of controlled substances in violation of the

    Controlled Substances Act, 21 U.S.C. §§ 801 *et seq*.

2.  This Court has jurisdiction over this matter by virtue of 28 U.S.C. §§ 1345 & 1355.

    Venue is appropriate in the District of Connecticut by virtue of 28 U.S.C. § 1395(b).

3.    The In Rem Defendants are $36,425.58 held in Wells Fargo account ending in

xxxxxxxxx6175, held in the name of Family Practice of Greater New Haven LLC; One

2011 Lexus IS350 bearing VIN:  JTHCE5C26B5000839; and $40,058.00 in United

States Currency;

4.    The defendants are located within the jurisdiction of this Court;

5.    On September 2, 2020, Anatoly BRAYLOVSKY, submitted an administrative claim of

ownership to the defendants.

## BACKGROUND OF INVESTIGATION

6.    Anatoly BRAYLOVSKY is a medical doctor and he is associated with Family Practice of

Greater New Haven, LLC, located at 850 North Main Street, Building 2 Suite #1B,

Wallingford, Connecticut, 06492.

7.    Jennifer BOUSQUET is an alleged co-conspirator of BRAYLOVSKY.  *See U.S. v.

Braylovsky and Bousquet*, 3:20-cr-94 (KAD).

8.    BRAYLOVSKY is licensed by the state of Connecticut as a "physician/surgeon."

BRAYLOVSKY's license, number 40951, was first granted on November 12, 2002.

According to the National Plan and Provider Enumeration System (NPPES) National

Provider Identifier (NPI) website, BRAYLOVSKY's primary taxonomy is Internal

Medicine.

9.    Family Practice of Greater New Haven, LLC is a medical practice that was registered

with the Connecticut Secretary of State on June 5, 2016.  BRAYLOVSKY is listed on the

Connecticut Secretary of State's website as the only member of the practice.

## The Medicare Program

10.    The Medicare program ("Medicare") is a federal health care program providing benefits to persons who are over the age of 65 or disabled. The United States Department of Health and Human Services ("HHS"), through its agency, the Centers for Medicare and Medicaid Services ("CMS"), administers Medicare.  Medicare is a "health care benefit program" as defined by 18 U.S.C. § 24(b).

11.    Medicare "Part B" pays for medically necessary outpatient medical services. Medicare authorizes payment for outpatient services if the care was actually provided and was medically necessary; that is, the services were required because of disease, disability, infirmity, or impairment. Medicare will not pay for services and treatment that were not actually provided or for which that patient did not meet the criteria necessary to justify the claimed service or treatment.

12.    Medicare "Part D" covers prescription drugs. This coverage is an optional benefit offered to everyone who has Medicare. In order for patients to receive Medicare drug coverage, they must join a Medicare plan that offers prescription drug coverage. Each plan can vary in cost and drugs covered.

13.    To enroll in Medicare, all providers are required to submit a Medicare enrollment application to CMS.  In submitting the Medicare application, health care providers certify that they understand and will abide by the federal laws and regulations governing their participation in Medicare.  When Medicare approves a provider's application, Medicare issues the provider a unique provider number.  Medicare uses the unique provider number to identify the rendering provider of the service in claims submitted for payment.

14.  BRAYLOVSKY enrolled in Medicare in August 2006. BRAYLOVSKY's provider number is 110009967.  Family Practice of Greater New Haven, LLC's provider number is C03560.  CMS contracts with the National Government Services, Inc. ("NGS") to perform all of the enrollment activities for providers in Connecticut.

15.  Individuals who qualify for Medicare benefits are commonly referred to as Medicare beneficiaries. Each beneficiary is assigned a Health Insurance Claim Number ("HICN").

16.  A Medicare provider is able to file claims with Medicare to obtain reimbursement for services provided to beneficiaries. A Medicare claim is required to set forth, among other things, the beneficiary's name and HICN, the services that were performed for the beneficiary, the date the services were provided, the cost of the services, and the name and identification number of the physician or other health care provider who ordered the services. Each time a provider submits a claim to Medicare, the provider certifies that the claim is true, correct and complete, and complies with all Medicare laws and regulations. The claims are generally submitted electronically.

17.  The Connecticut Department of Social Services ("DSS") provides medical assistance to low-income persons and people who could otherwise support themselves if not for the fact that they have excessive health care costs. DSS provides this assistance through the Connecticut Medical Assistance Program (CTMAP). CTMAP offers a comprehensive health care benefit package that includes the following:

    a.  HUSKY A - Family Medicaid;

    b.  HUSKY B - State Children's Health Insurance Program ("SCHIP");

    c.  HUSKY C - previously referred to as Medicaid, Title XIX, fee-for-service, or Adult Medicaid; and

d.  HUSKY D - previously referred to as Medicaid for Low Income Adults ("MLIA").

18.  The HUSKY programs identified above are joint federal-state government programs designed primarily to finance the provision of the medical services to the indigent. This affidavit refers to the various HUSKY programs above collectively known as "Medicaid."  DSS administers these Medicaid programs in Connecticut. The Medicaid program is administered at the federal level by the Centers for Medicare and Medicaid Services ("CMS") and is funded approximately 50 percent by the federal government. The remaining approximately 50 percent is funded by the State of Connecticut.

19.  Medicaid is a public plan or contract that pays claims submitted by participating health care providers for medically necessary benefits, items, and services rendered to Medicaid members.  As such, Medicaid is a "health care benefit program" under 18 U.S.C. § 24(b).

20.  Participating providers in the Medicaid program are required to maintain medical documentation of the services provided to Medicaid members for at least five years from the date of service.

21.  It is possible for Medicaid members to have one or more additional sources of coverage for health care services, including coverage by other health insurers or programs.  By law, all of the available third-party resources, including public or private health insurance plans, must meet their legal obligation to pay claims before the Medicaid program pays for the care of an individual eligible for Medicaid.  As such, Medicaid is generally the payer of last resort.

22.  BRAYLOVSKY is enrolled in the Medicaid program and has been so since at least October 2008.

23.     BRAYLOVSKY's practice accepts patients who are insured by Medicare, Medicaid, as well as commercial insurance plans.

24.     In order to bill health care benefit programs such as Medicaid, providers use a five-digit number, known as a CPT code, that identifies the nature and complexity of the service provided.  The CPT codes are listed in the Current Procedural Terminology ("CPT") manual, which is published annually by the American Medical Association.  CPT codes are universally used by health care providers to bill government and private health insurance programs for services rendered.  Virtually every medical procedure has its own CPT code and insurance companies pay a specified amount of money for each CPT code billed.  Within the CPT manual, there is also another set of health care procedure codes, known as Healthcare Common Procedure Coding System, or HCPCS, that identify products, supplies and services not otherwise identified in the CPT manual.

25.     Typically, providers submit CPT and HCPCS codes using a claim form, known as a CMS 1500.  The CMS 1500 form, completed by the provider or their billing contractor, includes, among other information, the name and provider number of the provider who rendered the service; the name of the patient who received the service; the date the service was performed; a code delineating where the service was provided; the procedure that was rendered (identified by CPT code); and the diagnosis of the patient's condition for which the service was rendered.  Most providers, including BRAYLOVSKY, submit claims to Medicaid and other health care benefit programs electronically.

26.     When a provider submits a claim, the provider certifies that the services identified on the form were "medically indicated and necessary for the health of the patient."

27.     There are specific CPT codes for routine office visits. BRAYLOVSKY bills Medicaid
        and Medicare for a large number of routine office visits, specifically CPT codes 99213
        and 99214. According to the CPT manual, CPT codes 99213 and 99214 are described as
        follows:

        *CPT: 99213 Office or other outpatient visit for the evaluation and management of an
        established patient, which requires at least 2 of these 3 key components:*

        *• An expanded problem focused history;*

        *• An expanded problem focused examination;*

        *• Medical decision making of low complexity.*

        *Usually, the presenting problem(s) are of low to moderate severity. Physicians typically
        spend 15 minutes face-to-face with the patient and/or family.*

        *CPT: 99214 Office or other outpatient visit for the evaluation and management of an
        established patient, which requires at least 2 of these 3 key components:*

        *• A detailed history;*

        *• A detailed examination;*

        *• Medical decision making of moderate complexity.*

        *Usually, the presenting problem(s) are of moderate to high severity. Physicians typically
        spend 25 minutes face-to-face with the patients and/or family.*

28.     CPT codes 99213 and 99214 are evaluation and management codes (office visits) for
        established patients. According to the Centers for Medicare and Medicaid, three key
        components of an E/M visit are history, examination, and medical decision making.
        Documentation should include an assessment, clinical impression, or diagnosis for each
        encounter; the initiation of or changes in the treatment plan, which may include patient

instruction, nursing instruction, therapies, and medication management; any referrals made, or consultations requested.

## Investigation into Braylovsky

29.     Law enforcement received information from numerous Sources of Information (SOI) that BRAYLOVSKY provides high quantities of oxycodone, alprazolam and Adderall pills to many of his patients.  The SOI have also provided intelligence that some of these patients, including but not limited to BOUSQUET of Wallingford, provide BRAYLOVSKY with pills in return for him prescribing them.

30.     Law enforcement also received information developed from a Cooperating Source (CS1) whose identity is known to agents. CS1 revealed that he/she was a patient and close friend of BRAYLOVSKY's in 2015 and 2016. CS1 stated that he/she received prescriptions for oxycodone 30 mg pills, and in return he/she would provide BRAYLOVSKY with half of the pills after filling the prescription at the pharmacy.

31.     In October 2019, law enforcement learned that some of BRAYLOVSKY's patients were using their Medicaid or Medicare insurance to pay for the medically unnecessary prescriptions that were in turn being sold for profit.

32.     Law enforcement learned that between January 2016 to April 2020 revealed that BRAYLOVSKY prescribed unusually large quantities of oxycodone, Oxycontin (extended release version of oxycodone), dextroamphetamine-amphetamine (Adderall), and alprazolam (Xanax) to many patients.  Several of the patients known to be involved are Medicare or Medicaid beneficiaries, and these patients are receiving large quantities of controlled substances which are paid for by Medicare or Medicaid.

33. The majority of patients receiving large quantities of controlled substances have the same or similar diagnoses. These diagnosis codes include, but are not limited to, M545 (low back pain), M5417 (radiculopathy, lumbosacral region), M542 (cervicalgia).

34. The lumbosacral region of the spine is the lower third of the spinal column. Radiculopathy of the lumbosacral region is a condition due to a compressed nerve in the spine that can cause pain in the lower back. The cervical region of the spine is the top third of the spine in the area of the neck and upper back. Cervicalgia is neck pain.

35. Primary care or internal medicine doctors do not generally prescribe large quantities of narcotics for extended periods of time.  It is reasonable that an internal medicine physician would prescribe narcotics for one of his or her patients for a limited period of time and would then wean the patient off of the prescribed narcotics and down to a non-narcotic pain medication such as acetaminophen or ibuprofen.  However, if a patient continued with low back pain, radiculopathy, or cervicalgia for an extended period, it would be expected that the patient would be referred to an orthopedist, neurologist or a pain specialist to attempt to find the cause of the pain and to gain better pain control.  It would be expected that an x-ray or an MRI would be performed to attempt to identify the cause of pain rather than continuing to prescribe large quantities of controlled substances for years at a time.  It would also be expected that a patient with chronic back or neck pain would be referred to a physical therapist as an adjunct therapy to provide pain relief.

36. Patients build a tolerance to opioids after taking them for an extended period of time. Patients with chronic pain and long-term use of opioids are known to be "opioid tolerant," meaning they require increasing doses of narcotics to gain adequate pain

control.  Patients with severe and chronic pain in the fields of oncology and hospice care, patients with chronic pain often require periodic increases in the dose of their narcotics.

37.     A review of the Medicare and Medicaid claims data shows that several of BRAYLOVSKY's patients have not had a change in the dose or schedule of their pain medications for several years. For example, BOUSQUET has been receiving oxycodone 30 mg tablets, 170-180 tablets for a 30-day supply since January of 2016. This equals about six tablets per day, or 180 mg of oxycodone in 24 hours. A primary care doctor would not prescribe medicine in this manner without taking the steps noted in the preceding paragraphs.

38.     BRAYLOVSKY continues to prescribe the same amount of medication on an ongoing basis.

39.     When BRAYLOVSKY prescribes medications to a Medicare or Medicaid patient, the prescription is sent to a pharmacy. That pharmacy fills the prescription and bills the patient's Medicare or Medicaid insurance. Medicare or Medicaid then pays the pharmacy for that medication. The pharmacy fills the prescription relying on BRAYLOVSKY's determination that the medication and dose are medically necessary. Medicare and Medicaid pay the pharmacy for dispensing the medication relying on the representation that the medication is medically necessary.

40.     Between January 1, 2016 and May 2, 2020, Medicare has paid a total of $2,645,971.19 for medications, $824,113.98 of which was for schedule II medications.[1] Medicare has paid a total of $203,164.98 for office visits between January 2016 and April 2020, under the codes 99213 and 99214.

---

[1] The Drug Enforcement Administration defines "Schedule II drugs, substances, or chemicals … as drugs with a high potential for abuse, with use potentially leading to severe psychological or physical dependence.

41.   Between January 2016 and April 2020, Medicaid has paid a total of $4,344,709.64 for

medications prescribed by BRAYLOVSKY, of which about $846,000 was for schedule II

medications. Medicaid has paid a total of about $386,975 for office visits between

January 2016 and April 2020, billed under the codes 99213 and 99214.

42.   BRAYLOVSKY is overprescribing controlled substances to a number of patients.  A

review of the claims data reveals that BRAYLOVSKY is causing Medicaid, Medicare

and other commercial insurance companies to pay for these medically unnecessary

controlled substances that BRAYLOVSKY is using in furtherance of his scheme.

<u>Source of Information # 1</u>

43.   On May 25, 2018, law enforcement spoke to a Source of Information (SOI1) familiar

with BRAYLOVSKY and his patients.  SOI1 stated that he/she worked for

BRAYLOVSKY in the past. According to State of Connecticut Department of Labor

records, SOI1 worked for Braylovsky from at least January 2016 to the third quarter of

2017. SOI1 provided law enforcement with several names of patients who he/she

believed were providing oxycodone and other prescription pills to BRAYLOVSKY in

return for him prescribing them to the patient.

44.   SOI1 told law enforcement that BRAYLOVSKY prescribed "a lot" of Percocet's to

patients and that sometimes the patients who received these pills would come in to

BRAYLOVSKY's office appearing "high." BRAYLOVSKY would prescribe those

patients Percocet[2] pills despite the signs of potential medication abuse. Based on his/her

experience as a medical assistant, SOI1 felt that many of these patients were not in need

---

[2] SOI1 referred to "Percocet pills," however the United States believves that SOI1 actually means oxycodone 30 mg
pills due to the fact that Percocet 30 mg tabs do not exist. Percocet is a combination of 2.5 mg up to 10 mg of
oxycodone combined with 325 to 650 mg of acetaminophen. Thus, SOI1 is using the term "Percocet"
interchangeably with oxycodone.

of such high quantities of opioids. When SOI1 asked BRAYLOVSKY if he noticed that

certain patients appeared "high," BRAYLVOSKY would deny that he noticed the

patient's condition and would continue to prescribe controlled substances to them.

45.     SOI1 stated that there were times he/she observed patients return to the office and give

BRAYLOVSKY loose, unused pills, to include trazodone, valium, and suboxone. In

addition, SOI1 observed loose pills, including oxycodone 30 mg tablets, located in and

around BRAYLOVSKY's desk. SOI1 recalled one occasion in the office where he/she

told BRAYLOVSKY that his/her back hurt and BRAYLOVSKY provided SOI1 (without

a prescription) two loose Percocet 10 mg pills and told SOI1 to take them.

46.     SOI1 recalled an occasion where a concerned family member of BRAYLOVSKY's

patient R.M. called the office to speak with BRAYLOVSKY.  This family member of

R.M. told BRAYLOVSKY that R.M. sold his/her (R.M.'s) pills and also used heroin.

Per SOI1, BRAYLOVSKY did not do anything with this information and continued to

prescribe oxycodone and Oxycontin to R.M.  Failing to heed warnings about patients by

family members is one of the red flags that may indicate drug diversion.

47.     One of the patients identified by SOI1 was BOUSQUET.  SOI1 stated that BOUSQUET

would come in for regularly scheduled appointments.  Upon being examined,

BRAYLOVSKY would provide BOUSQUET with a prescription for oxycodone or

Adderall.  BOUSQUET would subsequently fill the prescription on the same days

BRAYLOVSKY prescribed them for BOUSQUET.  SOI1 stated that on the same days

BOUSQUET filled the prescription, BOUSQUET would return to the doctor's office and

meet with BRAYLOVSKY in his office with the door closed.  SOI1 stated that on

multiple occasions, he/she observed BOUSQUET waiting in the parking lot of the office,

after hours.  SOI1 stated that once he/she or the final person left, BOUSQUET would enter the BRAYLOVSKY'S office and meet with him.  SOI1 stated that on the occasions he/she saw BOUSQUET at the doctor's office after hours, he/she returned to the parking lot after leaving and discovered that BOUSQUET was not inside her vehicle.

48.     Law enforcement has learned that BOUSQUET received 170 oxycodone 30 mg tabs, 75 Adderall 20 mg tabs, and 30 alprazolam 2 mg tabs per month from BRAYLOVSKY. The query shows that BOUSQUET has been receiving this combination for at least three years.  Furthermore, law enforcement has learned through toll records obtained via an administrative subpoena, BOUSQUET, using a cellular telephone, is frequently in contact with BRAYLOVSKY's cellular telephone.

49.     For BOUSQUET, between January 2016 and April 2020, Medicaid paid a total of $5,528.42 for the oxycodone, alprazolam, and Adderall prescriptions. Medicaid also paid a total of $7,720.88 for office visits coded as 99213 or 99214 during this time frame. BOUSQUET's diagnoses listed on the claims include M545 (low back pain) and M5417 (radiculopathy, lumbosacral region), as well as F900 (attention-deficit hyperactivity disorder, predominantly inattentive type). According to claims data and the CT PMP, BOUSQUET has not had any dosage adjustment or change in the type of opioid being prescribed since at least January of 2016.  It is a "red flag" that there has been no changes made to BOUSQUET's medication since 2016.

50.     SOI1 also provided information regarding patient E.W. who is alleged to have after hours meetings with BRAYLOVSKY as well.  SOI1 stated that E.W. would come in for regularly scheduled appointments during regular office hours.  After the appointments, BRAYLOVSKY prescribed E.W. high quantities of oxycodone pills as well as Adderall

and Alprazolam.  SOI1 stated that after E.W. filled the prescription, E.W. would return to BRAYLOVSKY's office, either during the day or after hours to meet with BRAYLOVSKY behind closed doors.

51.   Law enforcement learned that E.W. has been receiving a prescription for (200) two hundred oxycodone 30 mg pills, (120) one hundred twenty alprazolam 2 mg pills and (60) sixty Adderall 20 mg pills per month from at least October 2016 through January 2019.  Starting in April 2019, it appeared that BRAYLOVSKY was no longer prescribing any medications to E.W.  Law enforcement learned through toll records obtained via an administrative subpoena, E.W. is also frequently in contact with BRAYLOVSKY's cellular telephone.

52.   Patient E.W. is a dual beneficiary, meaning they are eligible for both Medicare and Medicaid insurance. For E.W., Medicare Part D paid about $3,564 for oxycodone, alprazolam, and Adderall prescriptions. Medicare Part B paid a total of $5,445 for office visits coded as 99213 or 99214 between the dates of January 2016 and April 2019. Medicaid paid a total of $1,291.43 for office visits coded as 99213 or 99214 between the dates of January 2016 and May 2019. E.W.'s diagnoses listed on the claims include M545 (low back pain) and M5417 (radiculopathy, lumbosacral region), as well as F900 (attention-deficit hyperactivity disorder, predominantly inattentive type), R1310 (dysphagia), E1140 (Type 2 diabetes mellitus with diabetic neuropathy, unspecified), and R002 (palpitations). E.W. did not have any dosage adjustment or change in the type of opioid being prescribed since at least between October 2016 to April 2019.

53.   After April 2019, it appeared E.W. was no longer receiving any prescription opioids from any provider.  Since June 2019, the only controlled substance prescription E.W. has been

receiving is Adderall from another provider, a nurse practitioner. E.W. has not received

prescriptions for alprazolam or oxycodone from any provider since June 2019.

54.     The total oxycodone dose that E.W. was being prescribed between January 2016 and

April 2019 was equal to 240 mg of oxycodone per day, or eight oxycodone tabs per day.

A patient on this dose of oxycodone would likely become opioid tolerant and would

require either a dose increase or change in opioid after a period of time.  In addition, a

patient with chronic pain who is taking large amounts of opioid medications on an

ongoing basis would not be expected to abruptly stop the opioid medications without

encountering complications.

55.     From January 2019 to April 2019, the number of pills being prescribed to E.W. decreased

only slightly over the four-month period, from 200 pills per month to 175 pills per month.

Abruptly stopping these medications would cause complications, including withdrawal

and/or severe refractory pain.  The amount of oxycodone being prescribed was still a high

dose when the medication was apparently stopped abruptly.

56.     SOI1 told law enforcement that another patient, R.S. also has afterhours meetings with

BRAYLOVSKY.  SOI1 told law enforcement that R.S. visited BRAYLOVSKY's office

for regularly scheduled appointments and would receive a prescription for high quantities

of oxycodone tablets. After R.S. filled the prescription, R.S. would return to

BRAYLOVSKY's office, either during the day or after regular office hours to meet with

BRAYLOVSKY behind closed doors.

57.     Law enforcement learned that R.S. receives a prescription for 180 oxycodone 30mg pills

per month and 30 alprazolam 2mg pills per month and has been receiving these

prescriptions at least the last three years.  Law enforcement also learned through an

administrative subpoena that R.S. is also in contact with the BRAYLOVSKY's cell phone. R.S. has commercial insurance.

<u>Controlled Purchases From Bousquet</u>

58. On December 6, 2018, law enforcement met with a confidential source, ("CS2") to conduct a controlled purchase of ten (10) Adderall pills from BOUSQUET in Wallingford, Connecticut.

59. Prior to the controlled purchase, CS2 provided law enforcement with text messages exchanged between CS2 and BOUSQUET on BOUSQUET's cellular telephone, prior to the meeting.  Within those text messages, CS2 tells BOUSQUET that he/she wants ten (10) Adderall pills and is available to meet BOUSQUET at 4:30 pm.  BOUSQUET tells CS2 to meet at the front door of her (BOUSQUET'S) house to conduct the transaction. Prior to CS2 meeting with BOUSQUET, law enforcement provided CS2 with $120.00 (one hundred and twenty dollars) worth of Wallingford Police Department buy money as well as a covert audio recording device.

60. After the meeting, CS2 told law enforcement that he/she met with BOUSQUET at the front door of her (BOUSQUET'S) residence as planned. BOUSQUET took ten (10) Adderall pills out of her pocket and provided them to CS2 in exchange for $120.00 (one hundred and twenty dollars) cash.  BOUSQUET then told CS2 that she (BOUSQUET) would have more Adderall pills soon and would inform CS2 when they were available. CS2 and BOUSQUET then parted ways.  After the exchange, law enforcement met with CS2 and CS2 provided the law enforcement with the ten (10) Adderall pills he/she purchased.

61.     On December 17, 2018, law enforcement met with CS2 to make plans to conduct another controlled purchase of Adderall pills from BOUSQUET in Wallingford, Connecticut.

62.     CS2 provided law enforcement with text messages exchanged between CS2 and BOUSQUET over the previous weekend (December 14, 2018, to December 16, 2018) which were made to facilitate the transaction. CS2 informed law enforcement that BOUSQUET explained to CS2 that BOUSQUET was not filling BOUSQUET's prescription for Adderall until Sunday, December 16, 2018 at 9:00 AM.  CS2 further explained that BOUSQUET told him/her that BOUSQUET would have the Adderall pills to sell to him/her on Monday morning (December 17, 2018), but was not sure if BOUSQUET would have the oxycodone pills.  CS2 stated that BOUSQUET contacted him/her on Sunday, December 16, 2018, and stated that BOUSQUET picked up her Adderall pills that morning. CS2 asked BOUSQUET if he/she could still come by on Monday morning to which BOUSQUET replied he/she could but BOUSQUET did not know if the oxycodone pills would be available.  While law enforcement was meeting with CS2, he/she received a phone call from BOUSQUET telling him/her that she could sell nine oxycodone pills.  Law enforcement provided CS2 with DEA serialized money and subsequently followed CS2 to BOUSQUET's residence to conduct surveillance of the transaction. Law enforcement observed BOUSQUET exit her residence and meet with CS2 by his/her vehicle before parting ways.  After the transaction, CS2 met with and provided to law enforcement twenty (20) Adderall 20 mg pills and nine oxycodone 30 mg pills.

63.     A review of Medicaid claims data corroborates the fact that BOUSQUET filled her Adderall prescription written by BRAYLOVSKY on December 16, 2018, using her

Medicaid card. On that date, Medicaid paid $48.47 for 75 Adderall 20 mg tabs, a 30-day supply.  The prescription was filled at Walgreens Pharmacy.

64. Medicaid claims data also shows BRAYLOVSKY billed Medicaid for an office visit (99213) on December 14, 2018, the Friday before BOUSQUET filled the prescription. The diagnosis code associated with the visit was F900 (attention deficit hyperactivity disorder, predominantly inattentive type), for which Adderall is generally prescribed. Medicaid paid $75.23 for this office visit.

65. The office visit on December 14 and the Adderall filled on December 16, paid for by Medicaid, were not medically necessary and were utilized to further BRAYLOVSKY's fraudulent scheme.

### Surveillance Of BOUSQUET Corroborates SOI1

66. On January 14, 2019, law enforcement received a phone call from Walgreens on East Main Street in Meriden, Connecticut, regarding a prescription for Adderall pills written by BRAYLOVSKY for BOUSQUET.  According to the pharmacist, BOUSQUET called the pharmacy that same day and stated that she would be there at around 12:30 pm to pick up the prescription.  At approximately 4:45 PM on the same day, law enforcement conducted surveillance of BRAYLOVSKY's office when they observed BOUSQUET drive into the parking lot.  BOUSQUET parked and entered BRAYLOVSKY's office, then exited approximately two minutes later and left the premises.

67. A review of Medicaid claims data showed that on January 14, 2019, BRAYLOVSKY billed for a fifteen (15) minute office visit with BOUSQUET, for which Medicaid paid $75.23. The claims data indicates that the primary diagnosis code for the visit was again F900 (attention deficit hyperactivity disorder).

68.    Upon information and belief, based on information gathered from sources of information, specifically SOI1, BRAYLOVSKY provided BOUSQUET with a prescription for Adderall which BOUSQUET picked up from the pharmacy on January 14, 2019. BOUSQUET then returned to BRAYLOVSKY'S office later in the day to meet with BRAYLOVSKY most likely to either return pills or provide him with cash for selling the pills, as described above by SOI1.

69.    On January 28, 2019, law enforcement conducted surveillance at Walgreen's Pharmacy, located at 284 South Colony Rd, Wallingford.  The pharmacist at Walgreen's confirmed that BOUSQUET was inside the pharmacy filling the oxycodone prescription. BOUSQUET then left Walgreens and was observed driving directly home.

70.    At approximately 9:54am, law enforcement observed a black vehicle enter BOUSQUET's driveway and approach the residence.  Law enforcement observed a white male exit the vehicle and approach BOUSQUET's house.  At approximately 9:55am, the white male returned to the vehicle and departed. The vehicle was discovered to be registered to a patient of BRAYLOVSKY's, J.H.  Law enforcement observed that the white male was the only occupant and matched the description of J.H. from a DMV photo and Facebook postings.

71.    The meet up with J.H. and BOUSQUET corroborates iMessages between the two that were reviewed as the result of a search warrant for BOUSQUET's iCloud account, which contained numerous iMessages between J.H. and BOUSQUET.  Within the iMessages, it appears that J.H. meets with BOUSQUET for the purpose of purchasing multiple drugs, to include "B" (30 mg oxycodone - referred to as "blues" or "b"), "A" (Adderall, based on

BOUSQUET's iMessages), and "S" (Suboxone or Subutex), based on BOUSQUET's iMessages.

72.   A review of Medicaid claims data reveals that on January 28, 2019, BOUSQUET filled a prescription written by BRAYLOVSKY for 170 oxycodone 30 mg tabs, a 30-day supply, using her Medicaid insurance. Medicaid paid $58.12 for the oxycodone prescription.

<u>Surveillance Of E.W. Corroborates SOI1</u>

73.   On February 4, 2019, law enforcement received a call from Walgreens pharmacy in Wallingford regarding a prescription for oxycodone pills called in for E.W. by BRAYLOVSKY.  E.W. was observed picking up the prescription that day.  Medicare claims data showed that the prescription for oxycodone was filled using E.W.'s Medicare Part D insurance which paid $37.50 for 180 tablets of oxycodone 30 mg tabs, a 30-day supply.  Medicare and Medicaid claims data also showed that E.W. had an office visit on that same day.  The primary diagnosis on the claim is M545 (low back pain). Because E.W. is a dual eligible patient, Medicare paid $64.39 and Medicaid paid $10.84 for the visit.

74.   At approximately 7:00 PM on February 4, 2019, E.W. left his/her residence and drove to BRAYLOVSKY's office.  E.W. was observed entering BRAYLOVSKY's office.  While BRAYLOVSKY and E.W. were inside the office, BOUSQUET arrived in her vehicle and entered the office as well.  At approximately 7:25 PM, E.W. left the office, and approximately five minutes later, BOUSQUET left as well.  BRAYLOVSKY remained at the office until approximately 7:45 PM before leaving.

75.   Upon information and belief, based on previous information obtained by SOI1 of BRAYLOVSKY meeting with both BOUSQUET and E.W. after hours or after

appointments to obtain pills or cash, it is believed that E.W. and BOUSQUET met with

BRAYLOVSKY at his office, on a day when E.W. picked up a prescription for

oxycodone pills, to conduct criminal misconduct.

Surveillance Of R.S. Corroborates SOI1

76.    On January 14, 2019, law enforcement determined that R.S. was scheduled to receive a

prescription for oxycodone pills from BRAYLVOSKY.  Law enforcement observed R.S.

go to CVS pharmacy to pick up the prescription.  R.S. then left the pharmacy and drove

directly to BRAYLOVSKY's office.  At that time BRAYLOVSKY's and R.S.'s vehicles

were the only ones in the parking lot.  Law enforcement observed R.S. enter

BRAYLOVSKY's office and leave just two minutes later.

77.    Upon information and belief, based on previous information obtained from SOI1, this

activity is consistent with R.S. receiving his/her prescription and returning to

BRAYLOVSKY's office to conduct criminal misconduct.

Arrest of T.L.

78.    During the week of February 11, 2019, law enforcement arrested T.L. in Wallingford,

Connecticut on State of Connecticut charges for possession of a controlled substance

(Adderall and Suboxone).  T.L. was discovered leaving BOUSQUET's residence and

conducting what law enforcement believed to be a drug transaction.

79.    After the arrest, T.L. stated that he/she had gone to BOUSQUET's house to purchase the

Adderall and Suboxone and provided law enforcement with information regarding the

purchase as well as information regarding BRAYLOVSKY.

80.    T.L. stated that his/her spouse has been a patient of BRAYLOVSKY's for approximately

ten years.  T.L. stated that BRAYLOVSKY has been prescribing his/her spouse 145

Oxycodone pills every twenty-eight days, and in order to get the prescription, BRAYLOVSKY makes T.L.'s spouse pay him (BRAYLOVSKY) $700 cash each month. T.L. stated that other patients pay BRAYLOVSKY at least $1,000 per month in order to get prescriptions for oxycodone pills.  T.L. stated that he/she received this information from E.W.

81.    T.L. stated that E.W. returns his/her prescription of oxycodone pills written by BRAYLOVSKY back to BRAYLOVSKY each month.  T.L. stated that E.W. will usually meet with BRAYLOVKSY after office hours and drop the prescription off at his office.  T.L. stated that based on conversations with E.W. in the past, he/she believes that other patients are also providing their prescriptions back to BRAYLOVSKY.

82.    T.L. stated that BOUSQUET is selling pills on behalf of BRAYLOVSKY.  T.L. stated that BRAYLOVSKY will give the returned pills to BOUSQUET who will in turn sell them for profit.

Debriefs of DEA CS3

83.    On October 8, 2019, law enforcement met with CS3 to debrief him/her regarding information relative to BRAYLOVSKY. CS3 stated that he/she first met BRAYLOVSKY via E.W, who is a mutual acquaintance of CS3 and BRAYLOVSKY. CS3 stated he/she has been on pain medication for a long time stemming from a serious accident which occurred in 2000. It was brought to the attention of E.W. that CS3 required pain medication and asked CS3 if he/she wanted to "get on the program … go see the doc."

84.    CS3 stated he/she met BRAYLOVSKY at a social club in Wallingford, Connecticut which hosted poker games and BRAYLOVSKY was an avid card player at the time.

E.W. was also part of this social scene.  Medicaid claims data shows that CS3 became an actual patient of BRAYLOVSKY in 2009.

85. After meeting BRAYLOVSKY, CS3 received a cash loan of $12,000 from BRAYLOVSKY that BRAYLOVSKY placed a very high interest rate on, to the point CS3 had difficulty repaying the loan.  According to CS3, this debt continued as of April 2020 and BRAYLOVSKY continues to add more interest to the loan as time progresses.

86. After receiving the loan from BRAYLOVSKY, BRAYLOVSKY began providing CS3 with pain medication, specifically oxycodone tablets.  BRAYLOVSKY increased CS3's dosage incrementally up to the 30 mg tablets.  Once BRAYLOVSKY began providing CS3 with oxycodone 30 mg tablets, BRAYLOVSKY arranged with CS3 to repay the aforementioned debt.  The arrangement consisted of BRAYLOVSKY prescribing CS3 (150) one hundred fifty oxycodone 30 mg tablets on a monthly basis. CS3 subsequently would sell 120 oxycodone tablets to another individual.  CS3 then paid BRAYLOVSKY $1,600 cash obtained from selling the oxycodone pills, of which $600 is credited towards the debt and the other $1,000 was kept by BRAYLOVSKY.  These transactions would take place at BRAYLOVSKY's office during a scheduled office visit.  Specifically, the pills from the prescription provided at the previous office visit are sold during the time between office visits.  The money is then given by CS3 to BRAYLOVSKY during the subsequent office visit, approximately 30 days apart.  The money transaction takes place in a patient exam room with only CS3 and BRAYLOVSKY present.

87. CS3 reported that his/her appointments last about one hour from the moment he/she walks in the door until he/she leaves the building.  Vital signs are taken first by the nurses or medical assistants. Then CS3 sees BRAYLOVSKY in the exam room for

approximately ten minutes. CS3 reported that BRAYLOVSKY does not perform a physical or medical exam of any kind during these visits and does not ask CS3 about his/her pain.

88.    According to Medicaid claims data, these office visits, where no medical examination or medical discussion occurs, are being fraudulently billed by BRAYLOVSKY under CPT codes 99213 or 99214.  As mentioned above, these two CPT codes require certain elements to be met, including a history, examination, and clinical decision making, for the claim to be paid.

89.    On October 28, 2019, law enforcement again met with CS3 in order to discuss BRAYLOVSKY.

90.    CS3 disclosed he/she does not personally know T.L. but learned about the arrest of T.L. from BOUSQUET.

91.    CS3 believed that T.L. alerted BOUSQUET of the arrest and the presence of law enforcement (specifically DEA).  The arrest of T.L. led to a meeting between BRAYLOVSKY, BOUSQUET and CS3.  This meeting took place inside a Dunkin Donuts located near BRAYLOVSKY's residence in Wallingford, CT.

92.    During the meeting, CS3, BOUSQUET, and BRAYLOVSKY discussed the arrest of T.L. and the potential scrutiny of the DEA.  BOUSQUET stated her desire to terminate the illegal activities in which they were all involved.  CS3 also expressed his/her desire to end the group's illegal activities, but BRAYLOVSKY wished to continue with the arrangement.  CS3 believed that BRAYLOVSKY did not want to stop the arrangement because of his fixation on the loss of monetary gain moving forward. It was determined the parties would continue their activities but proceed forward in a more cautious manner.

93.   During the October 28, 2019, debrief, CS3 relayed again to law enforcement that during
appointments with BRAYLOVSKY, BRAYLOVSKY did not perform a physical
examination on CS3 and did not ask him/her any medical questions.  BRAYLOVSKY
did not ask CS3 about his/her pain level, although CS3 goes to these appointments to
obtain prescriptions for pain medications/narcotics.  CS3 stated that during his/her
appointments, BRAYLOVSKY had a laptop computer on which he completes
documentation despite not performing a physical exam or asking any medical questions.
Medicaid claims data shows that these visits are billed by BRAYLOVSKY under CPT
codes 99213 or 99214 and Medicaid pays for these visits.

94.   CS3 stated he/she has been on Husky/Connecticut Medicaid for a long time.  CS3
informed law enforcement that BRAYLOVSKY's office has his/her insurance
information on file within the electronic medical record.  CS3 also stated that his/her
appointments and prescriptions are covered by the CS3's Medicaid insurance; he/she
does not pay out of pocket for the appointments or the medications.

95.   During the meeting, CS3 explained that BRAYLOVSKY is well aware that he/she sells
his/her prescription pain medications (oxycodone).  BRAYLOVSKY continues to
prescribe large quantities of oxycodone (150 pills/month) to CS3 knowing that he/she
only takes about 30 oxycodone for him/herself for the month and he/she sells the rest of
the pills for cash, which he/she gives back to BRAYLOVSKY.  CS3 explained that this
scheme is the sole reason for BRAYLOVSKY prescribing high quantities of narcotics to
CS3.

Consensual Monitoring of CS3

96.    On October 18, 2019, law enforcement conducted a consensual monitoring operation.

       The operation involved CS3 visiting BRAYLOVSKY for a regularly scheduled monthly

       doctor appointment where CS3 would obtain a new prescription for 150 oxycodone 30

       mg tabs. Prior to the appointment, CS3 was provided with $1,600 in DEA serialized

       money and equipped with an electronic audio recording and monitoring device to ensure

       the safety of CS3 and document the meeting.

97.    Upon information and belief based on the audio recording, BRAYLOVSKY did not ask

       CS3 about pain and it did not sound as if BRAYLOVSKY performed a medical

       examination.  CS3 confirmed no medical exam occurred during this visit.

       BRAYLOVSKY discussed going to Las Vegas "next weekend" and CS3 can be heard

       saying, "that'll help."  BRAYLOVSKY replied "Oh for sure."  CS3 stated that he/she

       passed BRAYLOVSKY the $1,600 in DEA serialized money during this visit.

98.    Medicaid claims data showed that BRAYLOVSKY billed Medicaid $110.00 for a visit

       under the CPT code 99213.  Medicaid paid a total of $75.23 for the visit.

99.    During the appointment BRAYLOVSKY also filled CS3's prescription for oxycodone.

       The prescription was for one hundred and fifty (150) 30 mg oxycodone tablets for a

       month supply and it was sent electronically to Walgreen's pharmacy in Meriden,

       Connecticut.

100.   Later that day, law enforcement met CS3 in the parking lot of Walgreen's pharmacy.

       CS3 proceeded to pick up the oxycodone prescription via the drive through pharmacy

       window while the agents observed.  After picking up the prescription, CS3 handed law

       enforcement the bag containing the bottle of oxycodone tablets.  Law enforcement

confirmed that the prescription was written by BRAYLOVSKY for CS3.  CS3 stated that he/she used his/her Medicaid card to pay for the medication.  Medicaid claims data revealed that Medicaid paid $48.20 for the prescription of oxycodone written by BRAYLOVSKY and filled by CS3 on October 18, 2019.

101.   On November 15, 2019, law enforcement conducted another consensual monitoring operation.  The operation again involved CS3 visiting BRAYLOVSKY for a regularly scheduled monthly doctor's appointment where CS3 would obtain a new prescription for 150 oxycodone 30 mg tabs. Prior to the appointment, CS3 was provided with $1,600 in DEA serialized money and equipped with electronic audio and video recording and monitoring devices to ensure the safety of CS3 and to document the meeting.

102.   At the conclusion of the meeting, CS3 informed law enforcement that BRAYLOVSKY did not conduct any physical examination of CS3 whatsoever, did not ask about CS3's pain level, and yet still authorized another prescription for 150 oxycodone 30 mg tablets. CS3 also informed the agents that during the meeting with BRAYLOVSKY, CS3 paid BRAYLOVSKY the $1,600 in serialized DEA funds that was ostensibly payment to BRAYLOVSKY from CS3 selling the previous months' oxycodone pills prescribed by BRAYLOVSKY.

103.   Upon information and belief, based on the recordings, BRAYLOVSKY did not conduct any verbal or physical medical assessment of CS3 and did not ask CS3 about CS3's pain level.  CS3's discussion with BRAYLOVSKY was largely centered around gambling and playing pool and there was no medical discussion at all.

104.   The video recording also depicts CS3 handing BRAYLOVSKY what appears to be a stack of money folded in half and shows BRAYLOVSKY putting this money into the chest pocket of his shirt, corroborating what CS3 told the agents during the debrief.

105.   Later in the video recording, CS3 is heard discussing his/her "friend" who has an upcoming medical appointment with BRAYLOVSKY.   BRAYLOVSKY asks CS3 the name of the "friend," and CS3 replies and states that this friend is "the one I sell my pills to." [3]

106.   A review of Medicaid claims data showed that BRAYLOVSKY billed Medicaid $110.00 for an office visit under the CPT code 99213 for the November 15, 2019 visit with CS3 and that Medicaid paid a total of $75.23 for this visit.   It should be noted that for the first time, BRAYLOVSKY changed CS3's ICD-10 diagnosis code to M5137 (other intervertebral disc generation, lumbosacral region), despite conducting no physical exam or asking any medical questions regarding CS3's physical health.   Medicaid claims data also reveals that Medicaid paid $48.20 for the oxycodone that BRAYLOVSKY prescribed to CS3 on November 15, 2019. [4]

107.   On December 17, 2019, law enforcement conducted another consensual monitoring operation.   Again, the operation involved CS3 visiting BRAYLOVSKY for a regularly scheduled monthly doctor's appointment in order to obtain a new prescription for 150 oxycodone 30 mg tabs.   Prior to the appointment, CS3 was provided with $1,600 in DEA

---

[3] Upon review of the video recording, the video captured CS3 smoking what appeared be marijuana prior to and while driving to his/her appointment.

[4] After the office visit on 11/15/19, DEA agents accompanied CS3 to Walgreen's Pharmacy in Meriden to fill his/her oxycodone prescription written that same day. Once filled, DEA agents took custody of the oxycodone pills.

serialized money and equipped with electronic audio and video recording and monitoring

devices to ensure the safety of CS3 and to document the meeting.

108.   Upon information and belief, based on the recordings, BRAYLOVSKY did not conduct

any verbal or physical medical assessment of CS3 and did not ask CS3 about CS3's pain

level.  CS3's discussion with BRAYLOVSKY was largely centered around gambling.

The only medical discussion was centered about CS3's brother having a heart attack and

BRAYLOVSKY described the basic physiology of how a heart attack occurs.  There was

no discussion regarding CS3's physical health.

109.   A review of Medicaid claims data showed that BRAYLOVSKY billed Medicaid $110.00

for an office visit under the CPT code 99213 for the December 17, 2019, visit with CS3

and that Medicaid paid a total of $75.23 for this visit.  Medicaid claims data also reveals

that Medicaid paid $48.00 for the oxycodone that BRAYLOVSKY prescribed to CS3 on

December 17, 2019.[5]

110.   On January 21, 2020, law enforcement conducted another consensual monitoring

operation.  Again, the operation involved CS3 visiting BRAYLOVSKY for a regularly

scheduled monthly doctor's appointment in order to obtain a new prescription for 150

oxycodone 30 mg tabs.  Prior to the appointment, CS3 was provided with $1,600 in DEA

serialized money and equipped with electronic audio and video recording and monitoring

devices to ensure the safety of CS3 and to document the meeting.  During the

appointment, BRAYLOVSKY did not perform any medical examination and did not ask

CS3 about his/her pain.

---

[5] After the office visit on 12/17/19, DEA agents accompanied CS3 to Walgreen's Pharmacy in Meriden to fill
his/her oxycodone prescription written that same day. Once filled, DEA agents took custody of the oxycodone pills.

111.   BRAYLOVSKY asked CS3 where he/she sells the pills to his/her friend.  CS3 told

BRAYLOVSKY that he/she sells the pills at his/her residence.  BRAYLOVSKY also

offered to buy CS3's oxycodone prescription from him/her.  At the end of the visit, per

BRAYLOVSKY'S instruction, CS3 handed the $1,600 to BRAYLOVSKY by placing it

underneath the patient chart in BRAYLOVSKY'S hand.  CS3 did not provide a urine

sample during the visit.  BRAYLOVSKY instead asked CS3 to come back in a couple of

days to provide a urine sample, however CS3 never returned to the office to do so.[6]

112.   A subsequent review of Medicaid claims data showed that Medicaid paid a total of

$75.23 for the January 21, 2020 visit.  Medicaid claims data also revealed that Medicaid

paid $45.78 for the oxycodone that BRAYLOVSKY prescribed to CS3 on January 21,

2020.  In addition, the Medicaid data revealed two charges, one for $38.00 and one for

$24.78, by Progressive Diagnostics, LLC, a lab that provides urine toxicology screenings,

with BRAYLOVSKY listed as the provider.  Despite the fact that CS3 did not provide a

urine sample on January 21, 2020, or at any time since that date, BRAYLOVSKY

appears to have sent a urine sample to Progressive Diagnostics, LLC, in CS3's name.

113.   On January 27, 2020, CS3 recorded an in-person conversation between CS3 and

BOUSQUET at CS3's home.  During the meeting, CS3 and BOUSQUET discussed the

fact that CS3 no longer wants to be a part of BRAYLOVSKY'S scheme.  BOUSQUET

told CS3 that he/she should sit down with BRAYLOVSKY to talk and discuss CS3's

desire to no longer participate in the scheme.  CS3 asked BOUSQUET if she would talk

to BRAYLOVSKY about setting up a meeting between CS3 and BRAYLOVSKY.

---

[6] After the office visit on 1/21/2020, DEA agents accompanied CS3 to Walgreen's pharmacy where CS3 filled the
oxycodone prescription sent in by BRAYLOVSKY that same day. Once filled, DEA agents took custody of the
oxycodone pills.

BOUSQUET stated that she had an appointment to see BRAYLOVSKY that week and she would talk to him (BRAYLOVSKY) then.  CS3 asked if BOUSQUET could talk to BRAYLOVSKY before that.  BOUSQUET then stated, "I'll talk to him [BRAYLOVSKY].  So, I can't get ahold of him…unless he…so he's got a phone and I have a phone and we don't have anybody else on the phones.  He keeps his off and every now and then he turns it on to check it to see if I texted him…*[inaudible]*…so that's kind of how that works.  So, it's only when he turns it on that I can get a hold of him."

114.   On March 1, 2020, CS3 called BRAYLOVSKY on BRAYLOVSKY's cell phone (XXX-XXX-6122) to arrange to meet with him at a Dunkin Donuts in Meriden, Connecticut, on Sunday, March 1, 2020.  On March 1, 2020, before the meeting occurred, law enforcement equiped CS3 with audio and video monitoring devices in order to surreptitiously record this meeting.  A surveillance team subsequently set up near the Dunkin Donuts and observed CS3 enter the Dunkin Donuts, followed shortly thereafter by BRAYLOVSKY, who arrived at the meeting in his 2011 Lexus IS350 bearing Connecticut license plate number 304RZR and VIN JTHCE5C26B5000839 (hereinafter "Defendant Vehicle").  The team continued surveillance and observed as CS3 sat down and conducted the meeting with BRAYLOVSKY.

115.   The purpose of the meeting between CS3 and BRAYLOVSKY was to see if CS3 could introduce an undercover DEA agent to take over CS3's role in the oxycodone prescription fraud scheme.  During this meeting, CS3 informed BRAYLOVSKY that CS3 wants to end CS3's participation in the scheme, explaining to BRAYLOVSKY that CS3 is "trying to leave that part of my life behind."  BRAYLOVSKY responded by stating that he was hesitant to bring a new person in to the scheme because it was "too

much of a risk."  BRAYLOVSKY also expressed concern that the DEA would catch on

to him prescribing too many oxycodone pills to CS3's "friend" (the undercover DEA

agent) explaining to CS3 that what CS3 is "getting [in monthly oxycodone pills] is above

and beyond."

116.    During this meeting with CS3, BRAYLOVSKY offered to take the oxycodone pills that

he prescribed to CS3 back from CS3 and ingest them himself and then provide his dirty

urine to CS3 so that the scheme can continue undetected.  BRAYLOVSKY stated, "I'll

take one or two when you come in [inaudible] then I'll give you my urine.  I'm not

worried about that."  When CS3 expressed continued reluctance with CS3's involvement

in this scheme, BRAYLOVSKY explained that the 150 oxycodone pills that he is

prescribing to CS3 are worth roughly $3,000 and states "I'm not going to give you that

prescription without getting something for it."  BRAYLOVSKY even stated to CS3,

"You want to give 30 [oxycodone pills that BRAYLOVSKY prescribed to CS3] to your

brother, give 30 to your brother.  I don't care."

117.    At the conclusion of the meeting, BRAYLOVSKY did not agree to meet with the

undercover DEA agent and the meeting ended.  The surveillance team then watched as

BRAYLOVSKY left this meeting in the Defendant Vehicle.

118.    On March 18, 2020, law enforcement conducted another consensual monitoring operation

to capture CS3's monthly appointment with BRAYLOVSKY in order for CS3 to obtain a

new prescription for 150 oxycodone 30 mg tabs.  Prior to the appointment, CS3 was

provided with $1,600 in DEA serialized money and equipped with electronic audio and

video recording and monitoring devices to ensure the safety of CS3 and to document the

meeting.

119.    Upon information and belief based on the recordings, it was noted that BRAYLOVSKY'S face was not visible in any part of the video due to the way that CS3 was holding the recorder. However, based on past recordings and surveillance of BRAYLOVSKY, law enforcement recognized BRAYLOVSKY'S voice as well as the watch that BRAYLOVSKY wears on his left wrist.

120.    During this visit, CS3 told BRAYLOVSKY that he/she had some pain in his/her calf muscle and heel as well as sciatic nerve pain.  CS3 was concerned it might be diabetes and BRAYLOVSKY reviewed the symptoms of diabetic nerve pain and provided CS3 with some sample Lidoderm patches.  BRAYLOVSKY instructed CS3 on how to use the patches and provided CS3 with a referral to a podiatrist.  BRAYLOVSKY did not ask CS3 if he/she was taking oxycodone for the pain and did not conduct a physical assessment of CS3.  Despite this, BRAYLOVSKY provided CS3 with a prescription for oxycodone 30 mg tabs.  The rest of the discussion between BRAYLOVSKY and CS3 was largely centered around gambling, the current COVID-19 Pandemic, and the fact that casinos were shut down.[7]

121.    A subsequent review of Medicaid claims data shows that Medicaid paid a total of $75.23 for the March 18, 2020 visit. Medicaid claims data also reveals that Medicaid paid $48.83 for the oxycodone that BRAYLOVSKY prescribed to CS3 on that same date.

122.    On April 30, 2020, law enforcement conducted a final consensual monitoring operation to record CS3's monthly visit with BRAYLOVSKY.  Due to the COVID-19 pandemic, the visit was conducted virtually using the FaceTime application on CS3's cell phone.

---

[7] After the 3/18/2020 visit, DEA agents accompanied CS3 to Walgreen's pharmacy where CS3 filled the oxycodone prescription sent in by BRAYLOVSKY that same day. Once filled, DEA agents took custody of the oxycodone pills.

BRAYLOVSKY also utilized the FaceTime application on his cell phone and called CS3 from cell phone (CS3 has stored this number in his/her phone under the name "Doc Tolly").  Prior to the telehealth appointment, CS3 was equipped with electronic audio and video recording and monitoring devices to document the meeting.  The virtual visit was conducted inside CS3's vehicle and law enforcement was present outside of the vehicle during the actual call.

123.    BRAYLOVSKY'S face can be seen clearly in the FaceTime video. During the visit, BRAYLOVSKY asked CS3 if he/she has taken his/her weight and blood pressure recently.  BRAYLOVSKY and CS3 then discussed CS3's dogs, playing cards online, and the COVID-19 pandemic.  BRAYLOVSKY asked CS3 if he/she has any health concerns to which CS3 replied, "No."  CS3 stated that he/she had no pain and no heartburn. BRAYLOVSKY told CS3 that there was a "certain amount of time" that BRAYLOVSKY had to keep CS3 on the phone.

124.    Later in the visit, BRAYLOVSKY reviewed CS3's medication list and asked CS3 if he/she was still taking some of the medications listed in CS3's chart, to include antibiotic eye drops, Zantac, Silenor (a sleeping pill), Adderall, Xyzol (allergy medication), cyclobenzaprine (a muscle relaxant), and Motrin.  CS3 asked BRAYLOVSKY for a refill of Motrin and after asking how often CS3 takes the Motrin, BRAYLOVSKY indicated that CS3 should still have some pills from the last fill.  BRAYLOVSKY asked CS3 if he/she gave some to other people or his/her brother and if that was the reason for running low.  BRAYLOVSKY stated, "I mean, I don't care," regarding CS3 giving the pills to other people.

125. Throughout the entire visit, BRAYLOVSKY never reviewed CS3's oxycodone use. During the review of the medication list, oxycodone was not mentioned. In addition, CS3 indicated that he/she had no pain or health concerns. Despite this, BRAYLOVSKY provided CS3 with another script for 150 oxycodone 30 mg tabs.

126. At the end of the telehealth visit, BRAYLOVSKY asked CS3, "Um, do you want me to give you a call later?" to which CS3 replied "if you'd like, or I could just drop by, you could unlock the car or something, if you want, I could just drop it off, after I pick it up, it's up to you." CS3 told BRAYLOVSKY that he/she could go to the office after 1:00 pm and drop it off and that he/she would rather have no contact with BRAYLOVSKY. CS3 offered to text BRAYLOVSKY later, to which BRAYLOVSKY replied, "well, what are you going to say?" BRAYLOVSKY lowered his voice and in the video appeared hesitant at the idea of CS3 putting "it" in the car. The conversation ended with BRAYLOVSKY agreeing to CS3 texting him when he/she arrives to drop "it" off. During the debrief of CS3, CS3 indicated that he/she was referring to the $1,600 when CS3 told BRAYLOVSKY he/she would drop "it" off.

127. After the visit, DEA agents accompanied CS3 to Walgreen's pharmacy where CS3 filled the oxycodone prescription sent in by BRAYLOVSKY that same day. Once filled, DEA agents took custody of the oxycodone. Law enforcement then provided CS3 with $1,600 in DEA serialized money in a white envelope to drop off at BRAYLOVSKY'S office as previously discussed. CS3 texted BRAYLOVSKY on the same number BRAYLOVSKY used to FaceTime CS3 and stated, "Hey I'm just pulling in your parking lot. Wanna [sic] unlock your car quick?" Agents observed CS3 approach the Defendant Vehicle, open the front driver's side door and place the envelope with the $1,600 in the car. As CS3 walked

away from the vehicle, he/she heard the car door lock.  CS3 sent a confirmation text to
BRAYLOVSKY that said, "All Set."  BRAYLOVSKY replied, "Ty," in
acknowledgement of the receipt of the money.

128.    During the time period from January 2016 to March 2020, Medicaid has paid a total of
$4,145.39 for office visits coded as a 99213 or 99214 allegedly conducted by
BRAYLOVSKY for CS3.  The diagnosis codes used for the office visits were M545 (low
back pain) and M5417 (radiculopathy, lumbosacral region), and M5137 (other
intervertebral disc generation, lumbosacral region).  Medicaid has also paid a total of
$3,323.28 for prescriptions written by BRAYLOVSKY for CS3 for oxycodone and
Adderall during the same time period.

<u>May 2020 Interview of SOI1</u>

129.    On May 7, 2020, law enforcement conducted an interview of SOI1 to obtain further
information regarding BRAYLOVSKY.  SOI1 had not spoken to BRAYLOVSKY in
several years.  During the interview, SOI1 reiterated some of the information he/she had
given to DEA agents back in 2018, but also provided some additional information
obtained.

130.    SOI1 stated that patient S.J. would fly to Connecticut from the west coast (possibly
California) to see BRAYLOVSKY and obtain his/her prescription for a large quantity of
opioids once a month.  S.J. is also the cousin of BRAYLOVSKY's wife/girlfriend.  Law
enforcement learned that S.J. receives a prescription for 150 oxycodone 10 mg pills per
month and 275 oxycodone 30 mg pills per month and has been receiving these for at least
the last three years.  In or around May 2020, law enforcement went to Walgreen's
Pharmacy in Meriden, Connecticut, and confirmed with the pharmacist that S.J. regularly

travels from California to Connecticut to pick up his/her prescription written by

BRAYLOVSKY.  S.J. has commercial insurance.

131.    While employed by BRAYLOVSKY, SOI1 began buying pills from S.J. and eventually

SOI1 would purchase half of the oxycodone 30 mg tablet prescription from S.J.  S.J. sold

the oxycodone 30 mg tablets to SOI1 for $18.00 each.  SOI1 believed that

BRAYLOVSKY was unaware of the arrangement he/she had with S.J., which lasted for

about one year until SOI1 terminated employment with BRAYLOVSKY.  SOI1 also

stated that he/she observed S.J. bring a large black safe to BRAYLOVSKY which

BRAYLOVSKY kept in the SUBJECT PREMISES.  SOI1 was not aware of the purpose

of the safe.

132.    SOI1 stated that he/she had contact with patient R.S. on or around April 30, 2020.  R.S.

previously lived in Meriden, Connecticut, but moved to either North or South Carolina

within the past few months.  Despite moving, SOI1 stated that R.S. continues to come to

Connecticut to meet with BRAYLOVSKY.  Law enforcement learned that R.S. continues

to receive a monthly prescription for 180 oxycodone 30 mg tablets, which R.S. fills at

CVS in Wallingford, Connecticut.  Patients visiting an out of state physician monthly to

obtain prescriptions for controlled substances is a red flag that is indicative of drug

diversion.

<u>Additional Medicaid Beneficiary Prescriptions</u>

133.    Upon information and believe based on additional review of Medicaid claims data,

BRAYLOVSKY is noted to prescribe large quantities of controlled substances to

additional patients other than those discussed set forth in this complaint.

134.  For example, a review of claims data for BRAYLOVSKY's patient N.D. revealed that N.D. is receiving extremely large quantities of controlled substances to include alprazolam, oxycodone, and Oxycontin.  From January 2016 to April 2020, Medicaid has paid a total of $75,108.79 for just these three medications.  Law enforcement has learned that N.D. has been receiving 80 Oxycontin 80 mg tablets for a 26-day supply (totaling 246 mg of oxycontin per day); 210 oxycodone 30 mg tablets for a 26-day supply (totaling 242 mg of oxycodone per day); and 60 alprazolam 1 mg tablets a 30 day supply (totaling 2 mg of alprazolam per day).  The primary diagnosis of the patient is M545 (low back pain) and M5417 (radiculopathy, lumbosacral region).  A patient with low back pain and radiculopathy should not require the amount of opioid medications that N.D. is currently receiving.

### $36,425.58 held in Wells Fargo account ending in xxxxxxxxx6175

135.  BRAYLOVSKY's medical practice, Family Practice of Greater New Haven, LLC, maintained a bank account at Wells Fargo, account number XXXXXXXXX6175, held in the name of Family Practice of Greater New Haven, LLC.

136.  BRAYLOVSKY was the sole signatory to the Wells Fargo, account number XXXXXXXXX6175.

137.  From approximately January of 2017 up and until June 4, 2020, BRAYLOVSKY's practice continued to use the Wells Fargo, account number XXXXXXXXX6175.  During this time period Medicaid and Medicare payments were deposited into this account.

138.  On June 4, 2020, pursuant to a seizure warrant, law enforcement seized $36,425.58 held in Wells Fargo account ending in XXXXXXXXX6175.

139.   Law enforcement identified at least 10 patients receiving medically unnecessary and fraudulent care, in violation of the statutes set forth above, from BRALOVSKY.

140.   The following patient information[8] represents Medicaid/Medicare payments that were paid to BRAYLOVSKY and that BRAYLOVSKY caused and were in violation of 18 U.S.C. § 1347 (health care fraud) and/or 21 U.S.C. § 841 (distribution of controlled substances).

    a.   Patient 1:  Medicaid/Medicare paid a total $297.92 for office visits in violation of the above statutes.

    b.   Patient 2:  Medicaid/Medicare paid a total $4,006.90 for office visits in violation of the above statutes.

    c.   Patient 3:  Medicaid/Medicare paid a total $1,682.78 for office visits in violation of the above statutes.

    d.   Patient 4:  Medicaid/Medicare paid a total $3,972.66 for office visits in violation of the above statutes.

    e.   Patient 5:  Medicaid/Medicare paid a total $3,749.63 for office visits in violation of the above statutes.

    f.   Patient 6:  Medicaid/Medicare paid a total $3,587.29 for office visits in violation of the above statutes.

    g.   Patient 7:  Medicaid/Medicare paid a total $3,864.36 for office visits in violation of the above statutes.

    h.   Patient 8:  Medicaid/Medicare paid a total $4,168.18 for office visits in violation of the above statutes.

---

[8] Although patients were previously described in this complaint, in this section they are merely numbered and, as such, some of the patient numbers herein may represent patients previously described.

     i.   Patient 9:  Medicaid/Medicare paid a total $7,025.70 for office visits in violation of the above statutes.

     j.   Patient 10: Medicaid/Medicare paid a total $4,070.16 for office visits in violation of the above statutes.

141.   The total amount money identified from the above patients is $36,425.58 and is subject to forfeiture.

**$40,058.00 in United States Currency**

142.   On June 4, 2020, after law enforcement executed the federal search and seizure warrant at BRAYLOVSKY's medical practice, BRAYLOVSKY gave written consent to the search of his residence on Wadsworth Lane in Wallingford, Connecticut.

143.   After receipt of BRAYLOVSKY's written consent to search and in the presence of the BRAYLOVSKY and his partner, law enforcement entered BRAYLOVSKY's residence and conducted the search. A drug detecting K-9 unit accompanied law enforcement in the residence.  No narcotics were found at the residence; however, the K-9 did alert to a bag containing a cell phone and commercial bug detector.

144.   A safe was located in BRAYLOVSKY's bedroom closet.  Upon request BRAYLOVSKY provided law enforcement with the passcode to access the safe.

145.   $40,058.00 in United States Currency was located in and around BRAYLOVSKY's bedroom closet safe; the vast majority of the currency was in the safe and the remaining currency was located on a shelf directly across from the safe.  The currency was seized and taken into custody as suspected proceeds of illegal narcotic sales and distribution activities in violation of 21 U.S.C. § 881(a)(6).

## One 2011 Lexus IS350 bearing VIN:  JTHCE5C26B5000839

146.   Throughout the course of the criminal investigation of BRAYLOVSKY, law enforcement monitored BRAYLOVSKY and his co-conspirators as they carried out their scheme. Methods of investigation included the use of Sources of Information, Confidential Sources, and the use of electronic monitoring equipment, inclusive of audio and video media.

147.   BRAYLOVSKY would often make use of the Defendant Vehicle to facilitate his narcotics trafficking operation.  One such occurrence took place on March 1, 2020. BRAYLOVSKY drove the Defendant Vehicle to a Dunkin Donuts location in Meriden, Connecticut to meet with a co-conspirator known to law enforcement as CS3.  The purpose of this meeting was to attempt to have BRAYLOVSKY agree to including an undercover DEA special agent in the criminal conspiracy.  After discussion between the parties, an agreement was not reached and BRAYLOVSKY departed the area utilizing the Defendant Vehicle.

148.   The Defendant Vehicle was observed parked at BRAYLOVSKY's medical office building parking lot during multiple controlled purchases of narcotics.  One such transaction was arranged on April 30, 2020 via a conversation between BRAYLOVSKY and CS3 where it was agreed that CS3 would leave $1,600.00 in the Defendant Vehicle for BRAYLOVSKY to retrieve.  CS3 arrived at the medical office building parking lot and advised BRAYLOVSKY that he was ready to complete the transaction.  Law enforcement observed CS3 approach the Defendant Vehicle, which was unlocked remotely by BRAYLOVSKY.  CS3 deposited the $1,600.00 in official use funds into the

Defendant Vehicle and closed the door, which was then locked remotely, concluding the transaction.

149. Based on the above, law enforcement seized the Defendant Vehicle from BRAYLOVSKY's residence driveway as facilitating property in violation of 21 U.S.C. § 881(a)(4).

## **CONCLUSION**

150. Based on the forgoing, the Defendant Assets, seized by the United States, were obtained by knowingly and willfully executing, or attempting to execute, a scheme or artifice to defraud any health care benefit program; or to obtain, by means of false or fraudulent pretenses, representations, or promises, any of the money or property owned by, or under the custody or control of, any health care benefit program, in violation of 18 U.S.C. § 1347 and are therefore, subject to forfeiture pursuant to 18 U.S.C. §§ 981(a)(1)(A); represents proceeds traceable to the exchange of controlled substances in violation of the Controlled Substances Act, 21 U.S.C. §§ 801 *et seq*., and are, therefore, subject to forfeiture to the United States of America pursuant to 21 U.S.C. § 881(a)(6); and/or are property used to facilitate the exchange of controlled substances in violation of the Controlled Substances Act, 21 U.S.C. §§ 801 *et seq*., and are, therefore subject to forfeiture to the United States of America pursuant to 21 U.S.C. § 881(a)(4).

WHEREFORE, the United States of America prays that a Warrant of Arrest In Rem be issued for the $36,425.58 held in Wells Fargo account ending in XXXXXXXXX6175, held in the name of Family Practice of Greater New Haven LLC ; One 2011 Lexus IS350 bearing VIN: JTHCE5C26B5000839; and $40,058.00 in United States Currency; that due notice be given to all parties to appear and show cause why the forfeiture should not be decreed; that judgment be entered declaring the property to be condemned and forfeited to the United States of America for disposition according to law; and that the United States of America be granted such other relief as this Court may deem just and proper, together with the costs and disbursements of this action.

Respectfully submitted,

JOHN H. DURHAM
UNITED STATES ATTORNEY


*/s/ David C. Nelson*
DAVID C. NELSON
ASSISTAN U.S. ATTORNEY
157 CHURCH STREET, 25TH FLOOR
NEW HAVEN, CT  06510
(203) 821-3700
FEDERAL BAR # ct25640
David.C.Nelson@usdoj.gov

<u>DECLARATION</u>

I am a Special Agent for United States Drug Enforcement Administration, and the agent assigned the responsibility for this case.

I have reviewed the contents of the foregoing Verified Complaint of Forfeiture and the statements contained therein are true to the best of my knowledge and belief.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 18th day of November, 2020.


/S/ Jonah Mazzacane
Jonah Mazzacane
SPECIAL AGENT
DRUG ENFORCEMENT ADMINISTRATION